UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

                Petitioner,

  vs.

John Hill,

                Respondent.        Civ. No. 05-1099 (PAM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Government's Petition to Determine Present Mental Condition of an Imprisoned Person under Title 18 U.S.C. §4245. A Hearing on the Petition was conducted on June 22, 2005, at which time, the Respondent appeared personally, and by Scott F. Tilsen, Assistant Federal Defender, and the Government appeared by Perry F. Sekus, Assistant United States Attorney. For reasons which

follow, we recommend that the Petition be granted, and that the Respondent be committed to the custody of the Attorney General, and that the Attorney General hospitalize the Respondent at the Federal Medical Center, in Rochester, Minnesota ("FMC-Rochester").

## II.  Factual and Procedural Background

The Respondent is a Federal prisoner, who is currently serving an eighteen (18) year sentence, which was imposed by the Superior Court of the District of Columbia, following his conviction for an aggravated assault, while he was armed.   The Respondent has been considered, unsuccessfully, for parole recently, and will not be considered for parole, again, until three years hence.

At the time of the Hearing, Dr. Collin J. Vas, who is a Board-certified psychiatrist, and who is a Staff Psychiatrist at the Federal Medical Center, in Rochester, Minnesota ("FMC-Rochester"), testified.[1]   Dr. Vas has been treating the Respondent since the Respondent's arrival, at FMC-Rochester, in July of 2003.   The

---

[1]The Respondent stipulated to Dr. Vas' expertise, and we concur in the view that he has the requisite training, education, and experience, to offer psychiatric diagnoses, prognoses, and opinions. See, Government Exhibit 1.  In addition, Dr. Vas' Mental Health Evaluation of the Respondent, which is dated June 6, 2005, was admitted without objection.

- 2 -

Respondent arrived at FMC-Rochester, on July 10, 2003, and Dr. Vas' treatment of the Respondent commenced on July 21, 2003. The Respondent had been incarcerated at the United States Penitentiary, in Atlanta, Georgia ("USP-Atlanta"). According to Dr. Vas, while he was at USP-Atlanta, the Respondent discontinued his medications, and his physical and mental health deteriorated to such an extent as to require placement in a private hospital. At that time, the Respondent was diagnosed with Neuroleptic Malignant Syndrome ("NMS"),[2] and Acute Renal Failure.

Upon his arrival, the Respondent was immediately transferred to the Mayo Clinic where he was placed in the Intensive Care Unit. Once stabilized, the Respondent was transferred to the Mayo Clinic's Psychiatric Unit, where he received Lorazepam[3] intravenously. Upon his discharge from the Mayo Clinic, after having undergone electroconvulsive therapy ("ECT"), the Respondent returned to FMC-

---

[2]NMS "is a hypermetabolic reaction to dopamine antagonists, primarily antipsychotic drugs, such as phenothiazines and butyrophenones." The Merck Manual, at pp. 1577-78 (17th Ed. 1999). "Characteristic signs are muscle rigidity, hyperpyrexia, tachycardia, hypertension, tachypnea, change in mental status, and autonomic dysfunction." Id. at 1578. "Treatment includes cessation of antipsychotic drugs, supportive care, and aggressive treatment of myoglobinuria, fever, and acidosis." Id.

[3]Lorazepam is a generic anti-anxiety drug. See, In re Lorazepam & Clorazepate Antitrust Litigation, 202 F.R.D. 12, 14 (D.D.C. 2001), rev. denied, 289 F.3d 98 (D.C. Cir. 2002).

Rochester, where he was diagnosed as having Schizophrenia, Paranoid Type, and transferred to the prison's general population.  Apparently, the Respondent remained compliant with this psychiatric care, until June of 2004, when he assaulted another psychiatric patient.  The Respondent was observed to be experiencing a psychiatric deterioration, and the assault was believed to be prompted by psychotic symptoms.  The staff attempted to intervene, and ordered the Respondent to stop hitting the other patient, but to little avail.  Indeed, several staff members were injured, by the Respondent, in that altercation.  The assault was sufficiently violent that the staff felt that the other patient's life was in jeopardy.

Dr. Vas testified that he has diagnosed the Respondent with two mental diseases:  1) bipolar affective disorder; and 2) manic, severe, with psychotic features.  According to Dr. Vas, a bipolar affective disorder is characterized by two types of mood abnormalities.  At times he suffers from depression while, at other times, he has manic episodes during which he has an elevated mood, lacks any need for sleep, has racing thoughts, grandiosity, and inordinate energy levels, with accompanying risk to harm others.  During each of the mood changes, the Respondent can suffer from paranoid delusions -- where he believes others are attempting to hurt him -- and hallucinations.  During his manic mood, the Respondent can go long periods without

sleep, can exercise uninterrupted for sixteen (16) hours, is easily provoked, and has

spoken about racing thoughts, with psychotic features.[4]

---

[4]Dr. Vas' characterization of a bipolar affective disorder closely parallels the description provided, as follows, by the Court in Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1081 n. 2 (10th Cir. 1997):

> Bipolar disorder has been defined as:
>
> a psychosis involving a mood disorder characterized by swings from mania to depression. Mania is characterized by elevated mood and associated behavioral responses. Characteristics of mania are hyperactivity, optimism, flamboyance, loud, pressured speech, garrulousness, distractibility, delusions of grandeur, disorganized behavior pattern, and poor judgment. Depression is characterized by lowered mood state and related behavior. Characteristics of depression are sadness, hopelessness, feelings of guilt and worthlessness, social withdrawal, psychomotor retardation and vegetative somatic symptoms, including anorexia, weight loss, and insomnia. The disability experienced from bipolar disorder ranges from mild to severe. Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 160-61 n. 2 (5th Cir.), cert. denied, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996)(citing Alan Balsam, M.D. & Albert P. Zabin, Disability Handbook 628-29 (1990)); accord Williamson v. Ward, 110 F.3d 1508, 1515 n. 9 (10th Cir. 1997)("Bipolar disorder is a mood disorder marked by alternating manic and depressive episodes.")(citing 1 J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine B-76 (1996)).

As related by Dr. Vas, he has conferred with his colleagues at FMC-Rochester, particularly when confronted with the need to urgently medicate the Respondent, who concur in his diagnoses of the Respondent's psychiatric condition. Dr. Vas described some of the Respondent's delusions by noting that, at times, he refuses to drink any liquids other than his own urine, he is afraid to leave his cell to shower for fear of being assaulted by other prisoners, he believes that his blood tests are a form of experimentation, and he fears that staff members are entering his cell at night in order to inject him with medications. At times, he showers so infrequently that he reeks of sweat. Since there is no basis for any of the Respondent's fears, Dr. Vas classifies them as delusions. The Respondent has missed, on some occasions, a sufficient number of meals, and has exercised to such an extent as to risk dehydration. He has ulcers on his heels, but refuses to wear his prescribed footwear for that condition.

According to Dr. Vas, the Respondent poses a threat to himself and to others. Since early May of this year, the Respondent has been placed in seclusion in a locked cell. His condition deteriorates until he is emergently medicated, which results in temporary relief, but he continues to lack sleep, overly exercise, refuse meals, and engage in threatening behavior toward others, including staff members. He was emergently medicated on five occasions after which his condition improved and then

relapsed as the medications were stopped.  His personal hygiene suffers as his mood swings, he has been observed drinking his own urine, and his cell smells of urine. Recently, he has attempted to grab staff members as they deliver food to the food slot in his cell door.  Dr. Vas testified that the Respondent is not suitable for placement in any institution other than a Federal Medical Center due to his treatment needs. Currently, the Respondent's condition prohibits him from partaking in the treatment programs he requires.  As related by Dr. Vas, upon being treated, the Respondent's conditions greatly improve so as to provide him a better quality of life.  When he was treated in 2003 and 2004, he "recovered beautifully" and participated in programs. Unfortunately, the Respondent's manic episodes can relapse at any time.  Dr. Vas envisions that the Respondent will be treated with medications, physical therapy, and supportive therapy.

On cross-examination, Dr. Vas conceded that, for some periods in the Respondent's past, his medical records are sparse.  The Respondent had no record of psychotic disease prior to his incarceration, although following his initial imprison-ment, the Respondent was placed in a private hospital on several occasions to be treated for psychiatric disorders, and was originally diagnosed as having Schizophre-

nia.[5]  As recounted by Dr. Vas, in his past, the Respondent has been medicated with

Benadryl, which is a sleep inducer; Melleril, which is administered for symptoms such

as hallucinations, delusions, and hostility; and Risperidone, which is used to treat the

symptoms of psychotic disorders, such as Schizophrenia.  Dr. Vas also acknowl-

edged that, upon his arrival at FMC-Rochester, the Respondent was diagnosed with

NMS which can develop when someone is in a catatonic state and is insufficiently

treated.  While NMS can also be caused by the administration of neurolyptic drugs,

such as Melleril, no one can say that was the cause of the Respondent's condition at

FMC-Rochester.

Dr. Vas testified that the Respondent was treated, at the Mayo Clinic, by

withholding all neurolyptic drugs, and by administering Ativan, which is an anti-anxiety

medication.  The Respondent was also treated with ECT, which is the most potent

type of therapy, but Dr. Vas is not considering the administration of ECT at this time.

ECT can have a temporary side-effect of having difficulty in recent memory.  Instead,

Dr. Vas plans on administering medications in the nature of mood stabilizers, together

---

[5]The Respondent was treated, on two occasions, at St. Elizabeth's Hospital which,
we understand, is located in the District of Columbia, where the Respondent was
convicted on the charges which led to his imprisonment.

with Ativan.  He may also require antipsychotic medications, and a reoccurrence of

NMS cannot be entirely ruled out.  Dr. Vas agreed that some persons with a bipolar

affective disorder will become better or worse without treatment.  However, in the

absence of treatment, the disorder can be lengthy, and may expose the individual, or

others, to a risk of harm.  Although the Respondent could be treated by being placed

in restraints, or in a total lockup, so as to insulate himself, and others from harm, he

would still be "tortured" by his affective problems.

Dr. Vas emphasized that, when treated in the past, the Respondent recovered,

although there may have been times when his recovery was spontaneous, as the Bureau

of Prisons does not have extensive records concerning the Respondent for the period

from 1995 through 2003.  Dr. Vas also noted that NMS is extremely rare, and can

result when someone is not medicated carefully.  Dr. Vas testified that he has had

almost daily conversations with the Respondent, and that, when the Respondent is

well, he is pleasant, friendly, helpful, organized, interested in his own welfare,

participates in programs, and is a gentleman.

Dr. Vas was also questioned about the disappointment that the Respondent

experienced before the Parole Board when he was considered, but rejected, for parole

in June of 2003.  While that rejection could be reflected in the Respondent's mental

state, Dr. Vas noted that the most dangerous circumstances, which are attributable to the Respondent's mental state, are of recent origin.  For example, over the past several weeks, the Respondent has voiced threats to the staff to hurt his attorney.[6]   In addition, he has assaulted several persons in the past and, within the past six (6) weeks, he has grabbed at staff members, and grabbed the glove of a Correctional Officer.

If the Petition is granted, the Respondent would be assigned to a doctor, and would be the subject of a due process hearing, before an independent psychiatrist, so as to determine whether forced medications would be appropriate.  Then, when the Respondent gets well enough, he would participate in group therapy led by the nursing staff.   Although it is possible that the Respondent will improve spontaneously, a course of medical treatment would expedite that process, and would eliminate the need for emergency treatments.  In addition, the staff at FMC-Rochester strives to return inmates to the general population at the earliest practicable time, and there is no reason

_____

[6]We note that, at the commencement of the Hearing, the Respondent's hands and feet were restrained.  Upon the Respondent's request, which was joined in by his attorney, the restraints on the Respondent's hands were removed.  Although the Respondent was somewhat vocal, during portions of the Hearing, he posed no physical threat to anyone.

to believe that the administration of antipsychotic drugs will present a problem, as he has been treated on such medications for long periods of time at FMC-Rochester.

### III.  Discussion

A.      Standard of Review.  In response to Vitek v. Jones, 445 U.S. 480 (1980), in which the Supreme Court held that the Due Process Clause forbids the involuntary transfer of a State prisoner to a mental hospital without a Court Hearing, Congress enacted Title 18 U.S.C. §4245.  Section 4245 ensures the exercise of judicial oversight concerning the involuntary transfer of prisoners from a Federal prison to a mental hospital, in order to "adequately safeguard the fundamental rights of the prisoner." Continuing Appropriations, 1985--Comprehensive Crime Control Act of 1984, H.R.Rep. No. 98-1030, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.Code Cong. & Admin.News 3430.

As promulgated, Section 4245 allows the transfer of a Federal prisoner to a mental hospital for care or treatment, only with the prisoner's consent, or a Court Order.  See, United States v. Horne, 955 F. Supp. 1141, 1143 (D. Minn. 1997), citing United States v. Watson, 893 F.2d 970, 975 (8th Cir. 1990), vacated in part on other grounds sub nom., United States v. Holmes, 900 F.2d 1322 (8th Cir. 1990), cert.

denied, 497 U.S. 1006 (1990).[7]  If the prisoner does not consent to being relocated to

a "suitable facility for care or treatment," however, the Government may move the

Court for the District in which the facility is located for a Hearing on the prisoner's

present mental condition.  Title 18 U.S.C. §4245(a).  The Hearing, in which the

prisoner is afforded the right to counsel, see, Title 18 U.S.C. §4247(d), is to deter-

mine whether there is "reasonable cause to believe that the person may be suffering

from a mental disease or defect for the treatment of which he is in need of custody for

care or treatment in a suitable facility."  Id.; see also, United States v. Bean, 373 F.3d

877, 879 (8th Cir. 2004).

The Statute provides that, prior to the Hearing, the Court may direct that a

psychiatric or psychological examination of the person be conducted, in order that a

report of that examination may be filed with the Court.  Title 18 U.S.C. §4245(b).  "If,

after the hearing, the court finds by a preponderance of the evidence that the person

is presently suffering from a mental disease or defect for the treatment of which he is

---

[7]We have found no case in which our Court of Appeals has addressed the
standards which apply under Section 4245, although the Court, in United States v.
Eckerson, 299 F.3d 913, 914 (8th Cir. 2002), did reference the standard enunciated in
United States v. Horne, 955 F. Supp. 1141, 1147 (D. Minn. 1997).  However, in
Eckerson, the standard, as adopted in Horne, had not been challenged by any party,
and that issue was, therefore, not squarely before the Court.

in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney General." <u>Title 18 U.S.C. §4245(d)</u>. If such a finding is made, the Government shall hospitalize the prisoner "for treatment in a suitable facility until he is no longer in need of such custody for care or treatment or until the expiration of the sentence of imprisonment, whichever occurs earlier." <u>Id.</u>; see also, <u>United States v. Epps</u>, 95 Fed.Appx. 202, 2004 WL 878462 at **1 (8th Cir., April 26, 2004).

As a Court in this District has explained, the Statute requires the reviewing Court to answer three questions: "Is the Respondent suffering from a mental disease or defect; [i]f so, is the Respondent in need of custody for care or treatment of that disease or defect; [and,] [i]f so, is the proposed facility a suitable facility?" <u>United States v. Horne</u>, supra at 1144; see also, <u>United States v. Washington</u>, 2005 WL 1277778 at *2 (D. Minn., May 11, 2005). We address those same questions with the benefit of the totality of the Record presented.

B.   <u>Legal Analysis</u>. Having carefully weighed the testimony presented at the Hearing, and the Exhibits admitted, we conclude that a preponderance of the evidence establishes that the Respondent is currently suffering from a mental disease or defect,

and is in need of custody for the care and treatment of that mental condition, for which

FMC-Rochester is a suitable facility to administer that care and treatment.

               1.      <u>Does the Respondent Currently Suffer from a<br>Mental Disease or Defect</u>?

        Although Section 4245 does not expressly define what constitutes

a "mental disease or defect," the plain meaning of that phrase most certainly

encompasses a "Bipolar I [affective] Disorder, Most Recent Episode Manic, Severe

with Psychotic Features."  See, <u>Government Exhibit 2</u>, at p. 3; see also, <u>United States

v. Chairse</u>, 18 F. Supp.2d 1021, 1026-27, 1028 (D. Minn. 1998)(concluding that

inmate suffered a "mental disease or defect," under Title 18 U.S.C. §4246, where he

was diagnosed with "bipolar I disorder.").  Moreover, a Bipolar I Disorder is defined

in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-

IV") as a mental disorder.  See, <u>DSM-IV</u>, at pp. 350-58.

        Nor do we have any hesitation in finding, by a great preponderance of the

evidence, that the Respondent currently suffers from that mental disorder.  We find

that Dr. Vas' testimony, and clinical opinions, to be competent, and wholly credible.

The Respondent has exhibited, within the last six (6) weeks, or so, the telling, and

unfortunate symptoms, of a bipolar affective disorder, with psychotic features.  He

exercises, apparently without relent, for sixteen (16) hours a day, fails to eat, shower, or maintain the hygiene of his person, and his cell, and he decompensates into a near catatonic state.  His behavior is threatening, and has required, on five (5) recent occasions, the emergent administration of drugs.  In the absence of such treatment, the Respondent has consumed his own urine out of a delusional fear that others at the prison are intending to harm him.  The Respondent offers no evidence to the contrary, and we concur in Dr. Vas' opinion, stated to a reasonable degree of medical certainty, that the Respondent suffers from a mental disease or defect that requires medical treatment.

        2.      <u>Is the Mental Disease or Defect in Need of Care and Treatment</u>?

As we have detailed, Section 4245(d) requires the Petitioner to establish that, because the Respondent suffers from a mental disease or defect, he is "in need" of care and treatment in a custodial setting.  Once again, the testimony of Dr. Vas, as to the pressing need for treatment and care, has been unrebutted.  More importantly, when the Respondent has been administered emergency medications, his condition has improved until he relapses through the refusal of medications.  No adverse side-effects from those recent administrations of medication have been

- 15 -

documented, and Dr. Vas expresses confidence, which we find convincing, that an extended course of treatment would be therapeutic and beneficial.

To be sure, the treatment of the Respondent's mental disease or defect will not be entirely free of some risk -- little in medicine allows for the treatment to be risk-free. Dr. Vas remains confident that the Respondent will tolerate his recovery from his Bipolar Affective Disorder, and his delusions and hallucinations, with minimal risk of developing, once again, NMS.   In fact, while under treatment in the past, the Respondent was described by Dr. Vas as actively participating in his programs, cooperative, and a gentleman.  Accordingly, judging from the recent past, inclusive of the need to emergently medicate the Respondent, the efficacy of a course of medications has been proven without unwanted side-effects.   Unfortunately, the Respondent would decline those medications, and slip into a relapse.

Lastly, there can be no doubt, on the totality of this Record, that the Respondent needs the treatment to alleviate the enormous risk of danger to the Respondent and to those around him.   Consuming one's own urine, urinating in one's cell, exercising without relent, the absence of even a personal hygiene, the refusal to consume foods, or submit to laboratory testing, and the direct threats to the prison staff members, which were attested to, without contravention, by Dr. Vas, demonstrate

the Respondent's need for treatment to relieve him of the current symptoms of his mental disease or defect. Without such treatment, the opportunity for the Respondent to gain a release to the general population seems remote, as does his potential to participate in proceedings before the Parole Board toward securing his release on parole. Therefore, given the overwhelming evidence presented, we find and conclude that the Respondent is in need of custodial care and treatment for his Bipolar I [affective] Disorder, Most Recent Episode Manic, Severe with Psychotic Features.

3. Is FMC-Rochester a Suitable Facility for the Administration of the Respondent's Care and Treatment?

A "suitable facility" is defined, somewhat tautologically, as one "that is suitable to provide care or treatment given the nature of the offense and the characteristics of the defendant." Title 18 U.S.C. §4247(a)(2). Dr. Vas testified that FMC-Rochester is suitable for the Respondent's custodial care, and that an ordinary Federal Correctional Institution would not be suitable. Indeed, the Respondent has been treated, when he is amenable to treatment, at FMC-Rochester, over the last nearly two years, and the facility is suited to effectuate that treatment. According to Dr. Vas, the facility has a "walking wing," which is a semi-locked area which would allow the Respondent greater freedom to move about once the palliative effects of his treatment

are realized.  There is nothing in the Record which counters Dr. Vas' opinion as to the

suitability of FMC-Rochester, which he expressed to a reasonable degree of medical

certainty, and we find and conclude that FMC-Rochester is a suitable facility for the

Respondent to receive his custodial care and/or treatment.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Petition to Determine Present Medical Condition of an

Imprisoned Person under Title 18 U.S.C. §4245 [Docket No. 1] be granted.

2.      That the Respondent be committed to the custody of the United States

Attorney General, who shall hospitalize him for treatment and care at FMC-Rochester

until he is no longer in need of such custody for care or treatment, or until the

expiration of the sentence of imprisonment, whichever occurs earlier.

Dated:  June 28, 2005                    s/Raymond L. Erickson
                                         Raymond L. Erickson
                                         UNITED STATES MAGISTRATE JUDGE

- 18 -

## N O T I C E

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than July 13, 2005,** a writing which specifically identifies those portions of the Report to which objections are made and the bases for those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of the Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than July 13, 2005,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.